Good morning everyone. Judge Rovner will be with us obviously by video. First case this morning is Ezell v. City of Chicago. Good morning. May it please the court. Suzanne Lose. I represent the City of Chicago, the Appellant and Cross Appellee in this case. This morning I will explain that Chicago's zoning of shooting ranges and the age restriction at those ranges do not run afoul of the Second Amendment, nor does the age restriction violate the First Amendment. I will explain that the district court erred in ruling that assigning shooting ranges to M districts violates the Second Amendment, but correctly ruled that the 500 foot buffer and age restrictions are constitutional. These provisions should be upheld under the framework this court set out in Ezell 1, and time permitting I will address the substantial burden test regulations as well. This case calls for less stringent scrutiny than did the absolute prohibition of shooting ranges. Does the city really want shooting ranges in Chicago? Do we want? Of course. We've made room for that. Well I would say of course. You're the only city in the country that doesn't have any. Your Honor, we want to comply with this court's order and have taken major steps in doing so by undertaking regulation to make sure that shooting ranges can come to Chicago and can do so in a fashion that promotes public safety. During the course of the submission of evidence, your expert witnesses didn't seem to have any evidence. Are Rule 30B6 witnesses? Well they were there to explain the reasons for the zoning, the Chicago zoning, and they did offer several reasons. Did they have any background to present? Any data to present? They did not present data. They did present our reasons and were not limited to the evidence that they actually had. Well, presenting reasons based on what? Their reasons based on, in Ms. Scudero's case and her experience in zoning and identifying what kinds of uses are intense uses by noting the nature of the particular use at issue. Well because Commissioner Crimble was a Rule 30B6 witness, in what context are we allowed to attribute her testimony to merely her personal opinion? Well I would submit that Commissioner Crimble did testify about two things. She testified about what she was called there to testify to as a Rule 30B6 witness, the reasons for the age restriction. But she also testified about how she thought the law should be changed. And the reasons that she gave were that the city does not want children and guns in the same place or children running around while guns are being fired. And that testimony is wholly consistent with the notion that children... Had she ever been in a shooting range or firing range? I believe she testified about that. I believe she had been once. She had not. I believe she was unsure... I'm sorry, I did not hear your answer. I believe she was asked about that and she was unsure she may have been. But I don't believe her presence in the firing range is relevant. Did she see any children running around in that firing range? Your Honor, she testified about her son going to a class. And these are her views of... Her other comments about her own son's experience in a shooting range and what might be wrong with the ordinance or how it should be changed do not bear on the city's reasons for the age restriction. That testimony was irrelevant and to the extent it was offered as a legal conclusion, it's not an appropriate subject of any witness testimony. That's for the courts to decide. The problem is that it's your obligation to support your reasons with evidence and the record doesn't demonstrate that that burden was carried. Well, hopefully you'll give me a moment to demonstrate that I think that we have carried our burden. And if I can start with the zoning restrictions themselves, those survive intermediate scrutiny because they are substantially related to important public safety objectives because there is a lot going on at shooting ranges to justify distancing them from more populated areas, such as the potential for gun theft, lead contamination, fires, and noise pollution. As for gun theft... Right, those concerns may justify targeted regulations. Maybe that's a poor word here. Narrowly tailored regulations such as noise buffers in terms of the building itself and other safety precautions with regard to the environmental concerns. And those aspects of the city's ordinance were upheld and are not being challenged here. The question is whether they justify this kind of use restriction. We submit that the city is permitted to take more than one precautionary measure when you're dealing with such a dangerous activity. Right. My point is that use restrictions, use zoning, is prohibitory, not merely regulatory. I'm sorry? Building codes are regulatory. Area requirements like lot size and setbacks and building size, those are regulatory. What we're talking about is use zoning here, which is prohibitory. I would say this is a regulation. It's a use regulation. It regulates the place of a particular... Different kind of zoning. There's area zoning and there's use zoning. Use zoning is restrictive. It's prohibitory. In other words, a use is prohibited everywhere it's not permitted. It is prohibited in the zones where it is not permitted. But that entire scheme is a regulation of the place. All of the city of Chicago is designed in different zones to try to foster development of all kinds. My point is that the city's reasons, its concerns about theft, its concerns about environmental contamination, its concerns about fire hazards can be addressed by more narrowly tailored regulations that are aimed at those concerns rather than these use restrictions, which have so minimized the locations where ranges can be cited. If I might add, I am not at all sure that I understand your argument about break-ins and gun thefts at shooting ranges affecting crime in the neighborhood. I understand the argument that people coming and going might be targets, but do we really think that thieves break into the range, steal guns stored or sold there, and then immediately use them just outside the range doors? I don't know that we have to show that. We do show that gun ranges and shooting ranges with gun stores, as we learned most of them generally do have gun stores, they do attract crime. And bringing that crime into a neighborhood is... Wait, wait, wait. Where did you show them? When did you show them? We're not talking about gun stores. We're talking about shooting ranges. We're talking about shooting ranges, which have gun stores in them. And what about the ones that don't have gun ranges? Let's talk about that. There are also thefts at gun ranges that do not have stores. We have testimony from... High crime area around shooting ranges? Here's the evidence that we have. We have evidence of 14 examples within a couple of years of both shooting ranges and gun stores. Did you read through that list and see how many times shooting range was mentioned as opposed to gun stores? There were shooting ranges involved. Once. Well... One time. The testimony in this case shows that shooting ranges and gun stores go hand in hand. Lieutenant Falstrom talked about all the ranges in the Chicago area that he knew about, also sold ranges, and we heard testimony from plaintiff's experts talking about... Well, the shooting ranges in Chicago are only for government, for police and... In the Chicago area, the ones surrounding the Chicago area. Did those thefts produce collateral crime in the immediate neighborhood? No. We do not have evidence of that. But nevertheless, we do have evidence that gun stores and gun ranges, shooting ranges, do attract theft. They attract... Like gas stations and convenience stores? Not like gas stations and convenience stores because the robbers of gas stations and convenience stores do not come out with large caches of firearms that are very often recovered in violent crimes down the road, as Lieutenant Falstrom testified. Ms. Luce, from a policy perspective, now that gun ownership is permitted within Chicago, would it not be better to have places where citizens can be trained in the safe use of firearms? Well, the Chicago Zoning Ordinance does allow for places where citizens can be trained in the safe use of firearms. But you continue to put impediments to those places. We have put in regulations, many of which are no longer challenged and many of which have been changed. We are not simply putting impediments before shooting ranges. And as for the opportunity to open a range, there are still plenty... There are plenty of places that shooting ranges can find a place to set up a shooting range and open their business. There's over 33,000 acres, 1,900 parcels of land. And moreover, the one person we know of who has made an effort to find a place that meets those requirements found a spot. That's Mr. Dion Robach. His deposition is at R-227-4. He shopped around in the M districts. He made a few phone calls to the Zoning Administration office to check on compliance, and he found a spot, which he did not... He had other business opportunities. He put this plan on the back burner, but that was his testimony. This is not an insurmountable burden. There is plenty of land available for development of shooting ranges in Chicago. Well, the fact that there is no range in the city limits for years hence suggests that you've made it infeasible. I would submit that does not mean that zoning provisions make it infeasible to open a range. The range has been under litigation the entire time. Regulations have changed a lot along the way. And we actually deposed several witnesses who were identified as people who wanted open ranges in Chicago to find out what their plans were and what the impediments were. And we heard, you know, it's expensive. It takes time to put together a plan, and the regulations were uncertain. Mr. Pearson, for example, with the ISRA, testified that, you know, he would have to wait and see how the regulations turned out at the end of this litigation. So we identified people who were interested, and we asked about their pursuit. And none of that revealed that zoning was a roadblock in their view. One person, right? I'm sorry? One person. Sure. We, you know, undertook discovery in this area, and we talked to Chris Hart at Action Target to identify all those who had spoken to him about the possibility of opening a range in Chicago. Now, Action Target is the major outfitter of gun ranges, and we spoke to the people he identified, and none of them identified zoning as the major barrier. Ms. Luce, what about the fact that people may now own and carry guns in residential areas for self-defense? How does that impact your argument about the dangers of guns in residential areas? Well, you know, I don't think it affects that, because our reasons for the zoning of gun ranges involves the attraction of gun theft, light contamination at ranges, the potential for fire when you have large volumes of ammunition stored there, and noise pollution that isn't the same thing. Do you have any record across the country of fires being extraordinarily happening at gun ranges as opposed to other locations? No, I do not have that. But we do know that we have combustible material involved, so there's a reason to take safety precautions. And why can't those concerns be addressed by narrowly tailored regulations aimed at those specific problems as opposed to these use restrictions? They can be, but again, we submit they can be addressed some more along the way, and I would submit that we have to. You've got to demonstrate a substantial fit between the means you've chosen to achieve those objectives, and that requires more than speculation. We don't rely on fire alone. We don't rely on the potential for lead pollution in the environment alone. We rely on these things in combination, because that's where the zoning administration Right, and in combination, all of those concerns can be addressed by more narrowly tailored regulations that are aimed at actually solving those problems instead of these restrictions on where gun ranges can locate. We submit they are narrowly tailored, and that the city's safety objectives would be achieved. Well, you can assert that, but you have to demonstrate it. Well, if a gun range is attracting theft into a B district, for example. Right, so you can require some security measures, as your expert in the last round of this litigation testified. That's not the approach that the court has taken in the First Amendment cases, like Renton or Yonge. I mean, bringing crime to a neighborhood is considered a concern that justifies. There were well-documented records in Renton and Alameda books about secondary crime effects on the immediate neighborhood where adult bookstores and adult entertainment was located. And there is no such record here, far from it. Well, we do have evidence that firing ranges, and especially ones with gun stores in them, are attractive to us. You have some highly anecdotal evidence of gun theft at gun stores. We have anecdotal evidence that I think adds up. We have 14 examples. We also have the HES report. And that's not proof of secondary effects, because you don't have any evidence to show that guns stolen from gun stores are used in the immediate vicinity of the gun store to commit a crime. But we do have evidence that this use brings crime to neighborhoods. What evidence is that? Our evidence of the thefts in gun stores within a two-year period, 14 of the larger ones involving dozens of guns stolen at one time. We have ATF's estimate over 16,000 firearms dealers reporting gun thefts in a year. And we have Lieutenant Johnson's testimony about tracing guns and gun crimes, and he testified that a large number of guns that are covered in crime are traced. That doesn't have any bearing on the location issue. And this is all about where they can locate. The location is a location where crime occurs, and we think those are best distanced from. It would occur anywhere, right? If they're susceptible of gun theft, that's going to occur anywhere. And what we're talking about is whether there's a record of collateral crime in the immediate vicinity, because we're talking about, again, use zoning, where they can locate. The crime may occur. We don't need to show that it will stop the crime. But this is a reason to remove. It's a new crime. It's a different type of crime. It brings gun runners and gun thieves into neighborhoods, and we submit those are better placed. Where do you get that? I read your brief. Where does that come from? Your experts didn't say that, that they bring crime into the neighborhood. Well, they attract theft, and that is a crime. So do grocery stores, convenience stores, gas stations. Well, they don't attract gun runners and gun thieves who will either steal guns that will enter the illegal market or be used in violent crimes. So it would bring a new type of theft. How different would your arguments be if a gun range did not also have a gun store? Our case would not be as strong. Right here we have an ordinance that there are still, you know, gun ranges do attract theft. We do still have evidence of that. But we also have a situation where gun ranges can, and from my understanding, from the testimony in this case, that they often do or will, because that's considered how you can run a range economically. And also gun ranges still are going to, you know, likely have large caches of weapons in the facility. Well, so does the Cabela's five miles from my house, and so do Bass Pro Shops that are located in and near normal commercial districts all over the country. Well, I don't know. I can't speak to those specific examples. I don't know them. I can't comment. And some of those gun sellers have ranges, right, and offer permitting classes and safety classes and range training. And other cities, I don't know whether those are industrial districts that are near commercial areas. I can't comment on the details of those specific examples. But we do know that there are a number of cities around the country that zone similarly, shooting ranges similarly to the way Chicago does. And as plaintiffs point out in their reply briefs. What cities? Charleston, Orlando, Atlanta. We have a list that is set out in our reply brief. And what plaintiffs pointed out in their reply brief is that, you know, ranges have opened up in those cities with similar type zoning. Orlando, for example, 1,000-foot buffer between schools, parks, churches, and residential areas, a conditional use in two industrial districts. And Orlando is industrial zoning also with a 500 buffer between residential districts. Those comparisons are really of limited utility here because we don't know what their zoning map looks like. We don't know where their schools and parks, et cetera, are located. It's very difficult to make those comparisons. What we do know is that no range has successfully opened under this regime in the city of Chicago. Well, I think what it does teach is that industrial zoning is not something that range owners stay away from. In fact, Mr. Giordano, their expert, testified lots of ranges are open in industrial areas. Right. It's obviously a compatible use. But why is it not also compatible with a commercial district or a business district? I don't know that there's any evidence to support that judgment. Well, we would submit that's because those are the more populated areas where these particular dangers that occur at shooting ranges. I mean, if we were just looking at this in terms of fact and function, we would construe this as a commercial use, right, or a recreational use maybe. Take away the whole gun control debate and that political overlay. Maybe a type of recreational use. Right. Yes. And those are treated differently one from the other under the zoning ordinance. You know, the United Center is going to be treated differently than, you know, a cabaret or an adult use. You know, playtime theaters is going to be treated very differently. So... Ms. Luce, are there really places for hunting in the city of Chicago? There are a couple. In the city of Chicago? There are a couple. Over Wolf Lake and Lake County are very limited, obviously. There aren't very many places appropriate for hunting in the city of Chicago. Can a 16-year-old hunt there? We have not prohibited minors from hunting there. We view the problem as very different. It's wide open, not as much congestion or potential for distraction, and, of course, not the same potential for lead contamination. You're not old enough to remember, but there was skeet shooting along Lakeshore, right downtown. Do you remember? Or you probably don't remember that. No, I don't remember it. Are you aware of that? I have heard about that, yes. Did that create a lot of crime there? I don't know the answer to that. Those were the people at the Saddle and Cycle Club, Judge Caney. I don't think it created a lot of crime there. It didn't create a lot of crime? I'm sorry. I'm not really familiar enough to address that. Well, it wasn't closed down because of crime, but there was lead pollution that closed it. Well, and lead pollution is a serious concern when it comes to miners especially, and I don't think that can be minimized. Maybe we've learned something since that range. I think, however, the ability to mitigate the deleterious effect of lead pollution has improved considerably since that was an aggregate. And yet it still exists. Why can't that be addressed by a narrowly tailored environmental regulation as opposed to a ban? Well, I would submit that both approaches are needed. And for this I would point to the study in the NIOSH report, that plaintiff's site, in their brief in their reply on page 21, which involved several ranges that were studied. Three rifle teams used one of the ranges that turned out to have extensive lead contaminations and the students had elevated lead levels. I thought that location didn't have appropriate environmental controls. That is true. And my point is cleaning problems aren't going to solve all the problems. Those children have lead contamination. Right, because it was not appropriately equipped to deal with that. That's correct. But I think the last example shows that problems can persist even when there are regulations as a practical reality. It will take time before these problems are discovered and shut down, and in the meantime children are poisoned. So I see that I'm out of time. Your time has expired, Counsel, but I'll give you three minutes on rebuttal. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. Alan Guerra for the appellees and the cross accounts in this case. By the time that we got to the city's final brief in this matter, the city was reduced to arguing with its own designated 30B6 witness, claiming that Commissioner Krimble had merely offered her personal opinion when she said that the age restriction was onerous, poorly drafted, overbroad, and should be rewritten. That's quite a statement, probably the strongest witness that we could call. It's very hard to see how a restriction which is described in that manner by the city's own witness could possibly pass constitutional scrutiny either under the First or Second Amendments. I'd like to start with that. When 16-year-olds set out to go hunting in the city of Chicago, something I guess we learn something new every day in this courtroom, they should probably have some training and some familiarity with firearms so that they're not a danger to themselves and to other people in the city. Commissioner Krimble understood that because she took her son to a shooting class for hunter safety when he was 12 years old,  that she believes it's appropriate to start teaching firearms safety to children at the ages of 14 and 15. We would not suggest a minimum age for the city. What we would suggest is that this is primarily a matter best left for parents to decide at what age, under what circumstances, their own children are responsible enough and mature enough in order to handle this type of training. But what we do know is that throughout American history, throughout this country, since time immemorial, it has been an essential aspect of our nation's history and traditions to instruct young people in the shooting sports and firearm safety, not just because it means that they are safer when they go out to hunt in a large city like Chicago, but also because this is essentially an aspect of people's own Second Amendment rights. The Heller case tells us that transmitting knowledge and use of arms to someone's children is an aspect of the right to arms, but also because it prepares those kids when they grow up to be able to exercise those rights as responsible adults. Minors have extremely limited Second Amendment rights of their own, if they have any. And the city needs very little justification to infringe upon whatever rights that they have. The fact that children can hunt and carry weapons elsewhere doesn't mean that the city needs to allow them to fire guns at a range. Issues with lead and the anecdotal evidence of children being killed or injured are not an important justification. Your Honor, we would agree that children do not have the same Second Amendment rights as adults, and nowhere near the same scope of rights that adults have when it comes to firearms. However, it is both the Second Amendment matter, and I'll address the First Amendment matter as well, an aspect of the rights of the parents of those children as well as the children themselves to obtain some instruction and some training and familiarity in the use of arms. Of course, the city has an interest in firearm safety when it comes to children, and there's no dispute about that. But this is a law that simply goes way too far. To quote the city's... Look, Mr. Poore, forgive me for interrupting, but the plaintiffs or anyone else, for that matter, may advocate to teens about the importance of gun rights, may teach about gun safety, may do whatever form of advocacy that they want. They can even teach shooting on realistic 3D simulators. There's no expressive content to firing a real gun as opposed to a simulator. Your Honor, there is expressive aspect in teaching firearm safety and in learning how to use guns. And as the Fourth Circuit found in the Edwards case, that type of class involving the actual use of firearms has at least First  The conveying of information, the training, a practical experience is a conduct that is inherently imbued with First Amendment protection. There's no way to teach someone how to use a firearm. Can anyone teach a class on firearm safety and usage rights? Can anyone do that? People can teach the class, yes, but they can't teach about... Right. And such a class can include as much advocacy about gun rights as you may want. The class can advocate that everyone should carry an assault rifle. The class can advocate that felons should have assault rifles, that minors should have assault rifles, could even teach minors about how to make a gun provided that that gun is not for sale. I do not understand where the restriction of expressive speech comes in. Your Honor... I really don't. Your Honor, all those subjects are not at issue in the case. We're not claiming that the right to teach various political ideals about firearms or anything else is being violated in this case. What we are saying though is that courts have recognized repeatedly, for example, in the Holder case, most recently at the Supreme Court, that training people to do something is not conduct, it is speech. The government had this argument in the Holder case most recently that providing instruction and training and how to do various things was merely conduct and not speech. The Supreme Court disagreed. It upheld the regulation, but it said that the training aspects were speech. In the Fourth Circuit, we had cases about teaching a class in fiber arts. There was a claim made by homeschool parents who wanted to access government facilities so they can have the fiber arts club meet at a facility. The court upheld the regulation, but upheld it as a restriction on speech because it understood that that classroom involved teaching and involved training and involved communication. And of course, in Edwards where you had a person who was teaching a class, a firearms safety class necessary to obtain a permit, and that involved not just speech, oral speech, but it also involved the training and the use of firearms. And when people go to a range, when someone were to go to the American Legion range here in Morton Grove and see Mr. Brown teaching his students how to use firearms, how to shoot firearms, everyone would understand that that is expressive conduct, that that is a form of learning which is going on. Now it's true that this regulation is not written in the sense that they're with some support that the regulation targets conduct, that is the conduct of having young people visiting a range. But that conduct undeniably burdens a form of expression because it prohibits access to the places where people would go and obtain this learning and this training. And so we have to, at the very least, at the absolute minimum, apply the O'Brien test. And here the city can't possibly prevail because its own witness said that the test was onerous. He said it should be rewritten. And once we have the city's 30B6 witness tell us that the law should be rewritten because it goes much further than necessary, then I suppose we've established our first amendment claim. Even if you look at it in terms of whether the governmental interest would be achieved less effectively absent the regulation, here the answer would have to be no. First of all, the city does have a great many regulations dealing with lead, lead abatement, lead safety. There's no shortage of these narrowly tailored regulations that Judge Sykes mentioned. And in fact, lead was never mentioned in any of these depositions. The city never offered lead abatement as a reason to have the age restriction or any other kind of restriction for that matter. This is something they came up with in their briefs later, but the evidence was not there initially. We know that small children don't go running around ranges anyway. It's something that no range owner would ordinarily tolerate. So a lot of that effect might not add anything, but perhaps more to the point, we know that reducing accidents is a goal and actually a goal, which is often achieved by firearms education. So if the city's goal is to reduce deaths and accidents, if they want to make the interaction between children, I should say minors, we're not talking about little children. If they want to make the interaction between people and firearms safer, then they have to take into account the positive aspects that are transmitted in this form of training, which they have not done at all. So it's not just a, they catch that, well, we're going to ban it and therefore it won't happen. And then we don't have to worry about the hazards of it. When they ban training and then when they ban education, they're actually increasing the risk of harm that they're supposedly attempting to ameliorate. The district court never got to the city's reasons for the age restriction, but found that there were no second amendment rights for children at all. Relying on the Fifth Circuit's decision in the NRA case and the First Circuit's decision in Rene E. That's right. We need to either distinguish or grapple somehow with those two cases. Sure. The evidence in those cases, I'm not sure that the majority opinion, and by the way, it was a very closely divided case, at least in the Fifth Circuit. We had an 8-7 vote on a proximity hearing, so reasonable people can disagree. But I'm not so sure that we can read that case, even the majority's opinion, to say necessarily that there are no rights at all because they went to step two of the analysis in that case. They wrote in their opinion that they suspect that the age restriction would survive at step one of the two-step process, but they felt compelled to at least go ahead and address it also in terms of the actual balancing under intermediate scrutiny in that case. Right. But was that in the nature of an alternative holding? It's kind of vague, Your Honor. I think you could – I'm not so sure. I think – I don't have the language directly in front of me right now, but the way the phrase was, you know, that they felt better about needing to go ahead and go on to the second step. I think they said they had doubts about whether it survived or failed at step one, but they quickly got off step one and spent a lot of effort on step two. And, of course, there are many judges who think that that case was decided entirely wrong. What we know from those cases and the record that they developed, as well as the record we developed here, is that there is an American tradition, a great American tradition, of teaching younger people, people younger than 18, how to use guns. Even the federal handgun ban, the juvenile federal handgun ban, has an exception for target practice, hunting, or a course of instruction in the safe and lawful use of a handgun. And this is as recently as 1994. Congress recognized that even handguns should be allowed or are normally expected to be allowed to people under 18, at least in a course of instruction. We're not talking here about children going to a store and buying guns and ammunition. That is absolutely not what we are arguing about. But what we are arguing about is whether or not the city's very valid safety concerns for people's ability to use firearms are going to be advanced when you ban people who are under 18 from obtaining training. And American tradition experience says, no, they won't. This is not a surprise that in this country where firearms are so prevalent and so deeply ingrained in our constitutional tradition, that there is also a tradition of giving access to firearms to people under 18, at the very least for the purpose of learning how to use them so tragedies are minimized and so they are better able to go ahead and exercise those rights when they do obtain the age of majority. I'd like to circle back a little bit to the zoning aspect, if I might, for just a minute. It's not only that there are no gun ranges in Chicago available to the public. All the efforts that were made, as far as the city was concerned, to go ahead and see if a range could be established, failed. And they all failed for zoning. That's in the record. People called. They tried to work with the zoning officials. And they hung up or were basically told, no, the property you're thinking of isn't available. It's absolutely in the record that zoning is the limiting principle here, which is the reason why there are no gun ranges available to the public. Now, that doesn't mean there are no gun ranges in Chicago, as you noted. There are a lot of gun ranges in Chicago. Those are ranges open to police, to government officials. I believe there's one at this courthouse. Mr. Gura, forgive me, but could you stay a little closer to the mic? Sure. I'm having some trouble hearing you. Sorry. I hope that's better. Oh, that's one. Thank you. Thank you. You're welcome. We know that there are many gun ranges in Chicago, and we also know something else. The city has never received a single complaint from anybody about the operation and use of these gun ranges by the police, by alarm companies, by federal judges perhaps in this courtroom. We know that it's not an issue, and it's not an issue because those gun ranges have some rules involved with them and because they're built to modern standards. Now, the city says, well, the government ranges, those are government ranges, and so we know that those are going to be really good. The private ranges might be a little bit more dangerous. We would dispute that. We're not so sure that this is the case in which to litigate, that everything the government does is necessarily going to be of a higher class than what the private sector is going to accomplish. But we do know, as a matter of fact, that ranges are simply not a problem when they occur, not just in other cities, but also in this city. The idea that zoning has not been an issue here, I don't think the evidence supports that. There's absolutely no evidence to justify any of these zoning restrictions whatsoever. It's not just that the evidence isn't sufficient. It doesn't exist at all. And I would also suggest that when the witnesses for Chicago were asked about their lack of evidence, they also said something else. They also admitted that all their concerns were speculative. So it's not just that they have even a deep belief in some of these anecdotes that have occurred in other places, but their concerns themselves are speculative. A crime once happened somewhere. It could happen here. And from there we go on to a gun range blowing up a liquor store 490 feet away from the location. I submit it doesn't make much sense in any event, unless there are any other questions. I think we're done. Judge Rovner, any further questions? Yeah, I did. Mr. Kerr, I did want to ask you something from the briefs. As for the substantial burden test, you argued that the law is determined but once, and that the substantial burden test was rejected below. But since Second Amendment means end inquiry as a sliding scale, couldn't it be that an ordinance that bans all firing ranges could be viewed under a much stricter burden and ordinances that merely regulate are viewed under a substantial burden test? We are not reviewing the same ordinance here, are we? Well, the ordinance may be different, but there are two ways we can do a substantial burden test, and I think this Court has foreclosed both of those. One way to do a substantial burden test, and I believe this is the way that the Second Circuit does it, there's no circuit in the country that does it, is it does it as sort of a preemptive test, sort of a threshold test, that if the burden is considered to be not substantial, then they don't even address anything beyond rational basis. Another way to think of it, and that's erroneous for reasons I think that were explained very adequately by this Court in Ezel 1, the other way to do a substantial burden test is to sort of wrap it into the Ezel 1 analysis, which is to say that we adjust the standard of review based upon the level of the burden, so that a very strong and heavy burden gets a higher level of scrutiny, and here we submit that level should be strict scrutiny given the very heavy burdens that are imposed, whereas an incidental burden, one that's more tangential perhaps, would go down no further than intermediate scrutiny. But there's no court in the country that's held that at the second step analysis that the courts should apply anything other than intermediate scrutiny, and even under intermediate scrutiny it's the government that bears the burden of showing some close fit between its interests and the regulation at hand, and Chicago hasn't come close to doing that. As far as going to this DiCastro second circuit style undue burden test, which is I think where the city was going, where they want to say, well these burdens aren't substantial, let's just have rational basis, I don't think that's appropriate, and yes it is at this point law of the case, because this case will never end. If every time there's an appeal the city can try again and try again and try again to rewrite the rules, if they were to succeed then they can go back to the beginning, write the rule that would have perhaps met that burden the first time, and we'd be back to square one. Litigation has to end at some point. And you believe so because, or I should say despite the fact that the original case involved banning shooting ranges, and this is a case regulating. Well it is, as Judge Sykes said, a ban, it's a ban of having a range in some places, but even if it were viewed, even if we were to view it as a regulatory case, under EZL1 you would look to the severity of the regulation as it were. The regulation here is very severe, the district court certainly thought it was severe, excluding 90% of the city's land, of the city's commercial land from gun ranges, 98% perhaps of all the land is a severe restriction. It's one that's caused a lot of problems here, as we've seen as the record has demonstrated. And so even if we were to view this as a regulatory measure, we would still wind up in strict scrutiny. And as far as the age restriction is concerned, that is a total ban. It's a ban on the rights of the people who would exercise those rights, but they can't access the range at all. For people under 18 or for the parents of those people who want to exercise their right to teach their children how to shoot, that does work as a total ban as well. In any event, even if you were to go to intermediate scrutiny, which is as low as you could go, there is still zero evidence here. You still have witnesses who said repeatedly over and over and over again, I don't know how many times, no data, no data, no data, it's speculative, they admitted it was speculative. You had one witness who said that the law should be rewritten because it's a terrible law. We agree with her. And, you know, it's hard to see how you can survive any form of constitutional scrutiny when your own witnesses as the government come in and say the law is terrible and needs to be rewritten. Thank you, Congresswoman. Thanks. Thank you. Thank you. I realize my time is short, and I'll just make a couple of very brief comments. First, with regard to the scope of the Second Amendment right for minors, I would just point out that a ruling on those grounds might well create a conflict in the circuits. Well, I'm not so sure about that. The case in the First Circuit had to do with the federal law banning juveniles from possessing firearms, but it has all kinds of exceptions. And the historical evidence that was marshaled in that case did not address itself to what's at issue here, which is the right of juveniles, minors, to engage in target practice, controlled target practice. Well, I would submit the case does have some bearing on the Second Amendment rights of juveniles, but I will also address your particular question. There is, as for the right to juveniles to engage in target practice at a shooting range, I would submit that there is a long history of restricting minors' access to firearms, and we point to regulations that were compiled by Mark Fresetto. Do any of those historical examples address target practice by minors, controlled target practice, supervised target practice? They do not. Some do contain exceptions. These are restrictions on minors that include a possession, use, loaning, and furnishing. Some of them were very broad and contained no exceptions for target practice. Sales, that sort of thing. Furnishing or loaning to minors as well. That was not just purchase or possess. And some did contain, a couple did contain exceptions for parental supervision and others did not, and we submit that that shows that the age cutoff varied and the scope varied about what minors would be allowed to do. Right, but it demonstrates that underage persons, persons under the age of 21, are not wholly without Second Amendment rights. Well, it demonstrates that a lot of minors were restricted from receiving firearms for any purpose at all, and that it was a matter of state regulation where the exact cutoff would be. Right, but the point at step one of the inquiry is whether there's conclusive evidence that minors are categorically unprotected, in other words, have no Second Amendment rights at all, do not have the Second Amendment right that's implicated in this case, which is the right to receive range training and target practice at a range. And I would submit these broad prohibitions on minors having guns for any purpose shows that this was a matter of state regulation. But you just said that they are not all-purpose laws. I'm sorry? You just said they were not all-purpose laws. Well, some of them were broad prohibition. Most of them were broad prohibitions. Two were a blanket prohibition on any possession. And there were exceptions. The others were prohibitions on sales and so forth, carrying. I see that my time has run. You can answer this question, certainly. Okay. Well, what I think that these restrictions show is that they were quite varied, and then it was left to the legislature to decide the scope of rights to be given to these older teens. The age of minority was often the cutoff point. And so I would submit that was not understood to be a Second Amendment right on behalf of minors. I'll give you another minute if you want to wrap up. Okay. I wanted to just briefly correct a comment about the record. My opposing counsel said that there were all kinds of examples of people checking in and being rejected on zoning, and that's just not the case. I already talked about the people we know who checked in. I believe he was referring to three or four phone calls that were made to Ms. Scudero. That's a normal part of the planning process for anybody who wants to open up a business, and they could have even all been Mr. Roebuck, who we know, after a few phone calls, found a compliant location. So in conclusion, we do ask that the judgment of the district court be reversed with respect to the M zoning of shooting ranges and affirmed with respect to the 500-foot buffer and the age restriction. Thank you. Thank you, counsel. Thanks to both counsel. The case will be taken under advisement.